UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

FILED
MAR 2 7 2019
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY

DAVID PINTO QUINTERO,

   Petitioner,

v.

ALEJANDRA MARIA
DE LOERA BARBA,

   Respondent.

Civil Case No. 5:19-148

## MEMORANDUM OPINION

When this child custody fight crossed the United States–Mexican border, it become a federal case. David Pinto Quintero seeks the return of his four children under the Hague Convention on the Civil Aspects of International Child Obduction, Oct. 25, 1980, T.I.A.S. No. 11,670 [hereinafter Conv.], *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986), and its implementing legislation, the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011 (ICARA). Those laws obligate this Court to "return a wrongfully-removed child to his country of habitual residence." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 342-43 (5th Cir. 2004). A child is wrongfully removed if the respondent took the child outside her home country in contravention of the petitioner's custody rights, as determined by the home country. *See id.* at 343. So the question is not whether the removal violated custody rights an American judge might award in the first instance, but only whether it violated custody rights a foreign judge already awarded.

To be sure, as the children's mother Alejandra Maria de Loera Barba points out, the Court may still decline to return the children if it finds they "object[] to being returned and

ha[ve] attained an age and degree of maturity at which it is appropriate to take account of [their] views," or if the Court finds "a grave risk that [their] return would expose [them] to physical or psychological harm or otherwise place [them] in an intolerable situation." Conv. art. 13(b). But since the Court does not do so, and because Quintero proves his children habitually resided in Mexico before de Loera spirited them to the United States, the Court will grant Pinto's petition.

I

A few months after getting married in Mexico City, Pinto and de Loera moved to Colorado so Pinto could pursue post-graduate education. *See* Pet'r's Ex. 6. While in Colorado, de Loera bore two children, M.A.P.D.L.-1 (now thirteen years old) and A.M.P.D.L. (now ten). *See* Pet'r's Ex. 9. Six years later, the family moved to Guadalajara, Mexico, where they had Z.D.P.D.L. (now eight). *Id.* After fifteen months in Guadalajara, the family moved back to Mexico City. The couple had their fourth child, M.A.P.D.L.-2 (now seven) a year later. *Id.*

For the next four years, the family lived alongside Pinto's parents and other relatives in Mexico City. Though Pinto and de Loera briefly considered relocating to the Pintos' house in Florida—even using its address to apply for credit cards and to obtain a driver's license, *see* Resp't's Exs. 2, 17, and exploring potential schools for their children, *see* Resp't's Ex. 3—they ultimately decided not to move, partly due to their children's relationship with their grandparents, who saw the children multiple times each week and paid for their education.

In October 2015, Pinto and de Loera separated. At the time, they informally agreed to share custody: Pinto would take the kids to school three days a week and would further spend every other weekend with them.

But six months later, Pinto filed for divorce. After retaining counsel, consenting to jurisdiction, and agreeing the family would be based in Mexico City, *see* Pet'r's Ex. 1 at 3, Pinto and de Loera entered into a provisional decree giving primary custody to de Loera, awarding visitation rights to Pinto, and prohibiting either parent from removing the children from Mexico City without the other's permission. *See id.*

A year into that provisional decree, de Loera decamped with the children to live eleven hours away in Nuevo Vallarta. *See id.* at 19-20. So Pinto went to court to defend his parental rights. When de Loera responded with allegations of abuse, the Mexican judge interviewed each child in camera to test her claims. But none corroborated de Loera's account, instead describing their father as "nice, good, [and] caring," noting "they [we]re happy to see him and they would love to stay and sleep at his home," and adding "that they love him very much and that they do want to see him." *Id.* at 24. (Some of the children admitted Pinto could be "grumpy" or "explosive," but they expressly denied ever being "beaten or told rude words." *Id.*) In part based on these representations, in November 2017 the Mexican trial court ordered de Loera to return the children to Mexico City. *See id.* But de Loera refused to comply, and continued to frustrate Pinto's attempts to visit his children in Nuevo Vallarta. *See* Pet'r's Ex. 2 at 38; Pet'r's Ex. 16. Both Pinto and de Loera appealed.

While that case was pending, de Loera brought a separate action against Pinto and his parents that accused them of domestic and "economic" violence. Pet'r's Ex. 4 at 5. So a second judge interviewed the children in camera to assess these new allegations. And he found their testimony wholly noncredible: it was based solely on what "their mother told them," *id.* at 71, and the youngest child admitted de Loera coached her testimony. *See* Pet'r's Ex. 5 at 5. The judge rejected all of de Loera's claims. *See* Pet'r's Ex. 4 at 71.

3

On May 21, 2018, a three-judge panel reversed the November 2017 child custody order. Concluding de Loera caused the children "serious psycho-emotional harm," the Mexican appellate court awarded Pinto primary custody, limited de Loera to visitation rights, and threatened de Loera with arrest if she did not return the children to Mexico City within twenty days after their school term ended. Pet'r's Ex. 1 at 38–40. The appellate court further required de Loera to allow Pinto to visit and communicate with his children, and prohibited either parent from removing the children from Mexico without the other's consent. *Id.* Despite de Loera's repeated—and unsuccessful—collateral attacks, that order became final. *See* Pet'r's Ex. 15; Pet'r's Ex. 79 at 5 (dismissing de Loera's attempts to overturn the May 2018 appellate decision as "unfounded" and representing a "notorious and clear impropriety").

The next week, armed with the Mexican appellate court's final order, Pinto traveled to Nuevo Vallarta to visit his children. But he couldn't find them. School administrators reported they had been missing all week, and the house where they lived had been abandoned. *See* Pet'r's Exs. 23–25.

Pinto searched for his children to no avail, even after seeking help from Mexican authorities. Successive calls and emails to de Loera and her family went unreturned; he repeatedly attempted to email the children directly, yet only occasionally obtained a response. *See* Pet'r's Exs. 25–52. But on January 30, 2019—eight months after the Mexican appellate court order—Pinto's cousin thought he spotted de Loera picking up the children at a San Antonio Montessori school. Subsequent investigation confirmed de Loera secreted the children to San Antonio, where they lived in a house held by a corporation controlled by her mother. *See* Pet'r's Ex. 8.

That investigation led to this petition. On February 19, 2019, considering the "substantial risk that upon being notified of this proceeding, [de Loera] may remove the Children from the Court's Jurisdiction," Chief Judge Garcia granted Pinto's ex parte application for a temporary restraining order (TRO) and for a writ of execution to take physical custody of the children. Order Granting TRO & Writ of Execution at 2, ECF No. 7. (Chief Judge Garcia subsequently extended the TRO to March 19, 2019 over de Leora's objection. *See* Order Granting Mot. Extend TRO, ECF No. 30.) The next day—510 days since he last saw them—Pinto was reunited with his four children.

One day after that, de Loera's parents sued in Texas state court "to modify the parent–child relationship" and to obtain relief specifically foreclosed by the TRO. After waiting four days to serve Pinto, the grandparents persuaded the state court to set an emergency hearing before this Court had a chance to decide Pinto's petition. So this Court stayed those proceedings. *See* Order Granting Pet'r's Emergency Mot., ECF No. 39.

The Court also denied de Loera's successive requests to appoint an attorney or a guardian ad litem for the children. *See, e.g.*, Order, ECF No. 36. For one, children do not generally participate in Hague Convention proceedings, and this case lacks the exceptional circumstances where a guardian ad litem would assist the court, particularly given this case's expedited posture—a posture further accelerated by de Loera's refusal to extend the TRO. *See Chafin v. Chafin*, 568 U.S. 165, 179 (2013) ("[C]ourts can and should take steps to decide these [Hague Convention] cases as expeditiously as possible, for the sake of the children who find themselves in such an unfortunate situation."); *cf. Sanchez v. R.G.L.*, 761 F.3d 495, 507-08 (5th Cir. 2014). And the Court denied de Loera's request for the Court to individually interview each child in camera to consider whether equity compelled modifying the TRO, though the Court agreed to

5

interview the thirteen-year-old in camera to ascertain the applicability of the Hague Convention's mature-child-objection exception.

The Court then held a four-day hearing on the petition. This opinion follows.

## II

Because this case arises under the Hague Convention, the Court has subject matter jurisdiction under both 28 U.S.C. § 1331 and the ICARA, which gives district courts original jurisdiction over actions arising under the Hague Convention. *See* 42 U.S.C. § 9003(a). Venue is proper in the Western District of Texas since the children were in San Antonio when Pinto filed the petition. *See id.* at (b).

## III

Though Hague Convention cases may present challenging facts, the legal inquiry is straightforward. The focus is not whether the foreign court's judgment was right, but only whether its order was infringed. To show wrongful removal of a child protected by the Hague Convention, a petitioner must prove three elements by a preponderance of the evidence: First, that the respondent removed or retained the child outside their country of habitual residence. *See Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012) (citing § 9003(e)(1)). Second, that the removal violated the petitioner's custody rights. *Id.* And third, that "at the time of removal or retention those rights were actually exercised . . . or would have been so exercised but for the removal or retention." *Id.* (internal quotation marks omitted) (quoting Conv. art. 3).

Here, the Court concludes Pinto carries this burden. Additionally, the Court declines to apply either of de Loera's claimed affirmative defenses, since she fails to prove either by the corresponding burden.

A

As to the first wrongful-removal prong, Pinto argues the children originally habitually resided in Mexico, citing both the five-plus years the family spent in Mexico City until de Loera absconded to Nuevo Vallarta, and also de Loera's admission to a Mexican court that the family was based in Mexico City. For her part, de Loera argues the children's country of habitual residence should be the United States, based on the family's shortlived plan to relocate to Florida.

Determining a child's country of habitual residence turns on "the parents' shared intent or settled purpose regarding their child's residence." *Larbie*, 690 F.3d at 310. In cases like this one, where "the child is too young to decide residency on the child's own," the last place "'both parents intended for the child'" to live controls absent "'objective facts point[ing] unequivocally to [an alternative] conclusion.'" *Cartes v. Phillips*, 865 F.3d 277, 282-83 (5th Cir. 2017) (quoting *Delgado v. Osuna*, 837 F.3d 571, 578 (5th Cir. 2016)).

Under this test, the children habitually resided in Mexico. A preponderance of evidence shows Pinto and de Loera most recently agreed to locate their family in Mexico City. For starters, it was the last place they lived as husband and wife, raising their family and giving birth to their fourth child over a five-year period. Even accepting de Loera's testimony that they briefly contemplated moving to Florida during this period, they eventually abandoned those plans and reverted to Mexico City. And both Pinto and de Loera remained in Mexico City after the divorce, at least until de Loera disappeared to Nuevo Vallarta. Indeed, until Chief Judge Garcia issued the TRO, the last place Pinto saw his children was Mexico City.

Because the children habitually resided in Mexico, and because de Loera admits removing and retaining her children in the United States, *see, e.g.*, Resp't's 1st Am. Answer ¶ 7, ECF No. 34, the Court concludes Pinto proves the first prong of wrongful removal.

**B**

Since Pinto proved de Loera removed the children from their country of habitual residence, the "question [now] becomes whether the removal or retention violated" Pinto's custody rights under Mexican law. *Larbie*, 690 F.3d at 307. Though "[t]hese rights need not be enshrined in a formal custody order issued before the removal," *id.*, Pinto's are: the Mexican appellate court's May 2018 order.

De Loera argues the May 2018 order should not bind her because she was never personally served with it. But this argument fails from the start. Even if the May 2018 order does not apply, Pinto would still have custody rights under the Mexican trial court's November 2017 order, or even under the basic *patria potestad* authority de Loera concedes he would have under Mexican law. *See Gallardo v. Orozco*, 954 F. Supp. 2d 555, 573 (W.D. Tex. 2013); *Munoz v. Ramirez*, 923 F. Supp. 2d 931, 949-52 (W.D. Tex. 2013); *Bernal v. Gonzalez*, 923 F. Supp. 2d 907, 917-19 (W.D. Tex. 2012); *Saldivar v. Rodela*, 879 F. Supp. 2d 610, 623-27 (W.D. Tex. 2012); *Castro v. Martinez*, 872 F. Supp. 2d 546, 555 (W.D. Tex. 2012). Though Pinto's custody rights under these arrangements may be less extensive than his rights under the May 21 order, they would still justify relief under the Hague Convention.

Moreover, the Court finds de Loera advances a distorted view of Mexican law. Rafael Trabolsi, Pinto's Mexican lawyer, testified Mexican law did not require personal service of the

May 2018 order—its subsequent publication put de Loera on notice.[1] *See also* Pet'r's Ex. 1 at 92. And it's obvious de Loera at least knew of and recognized the gravity of the May 2018 order since she twice sought its reversal. *See* Pet'r's Exs. 15, 79.

In sum, Pinto shows his children's wrongful removal contravened his custody rights.

C

Pinto clears the final and "relatively easy" determination that he would have exercised his parental rights. *Larbie*, 690 F.3d at 307 (internal quotation marks omitted) (quoting Elisa Pérez-Vera, Explanatory Report ¶ 9, *in* 3 Hague Conference on Private International Law 426, 428 (1982)). After all, "courts 'liberally find' that rights of custody have been exercised unless evidence demonstrates 'acts that constitute clear and unequivocal abandonment of the child.'" *Id.* (quoting *Sealed Appellant*, 394 F.3d at 344-45). Indeed, "[o]nce it determines that the parent exercised custody rights in *any* manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." *Sealed Appellant*, 394 F.3d at 345 (emphasis added) (internal quotation marks omitted) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)).

Here, the record supports Pinto's claim that he exercised his rights under the provisional agreement, and that de Loera repeatedly thwarted his efforts to exercise his rights under the November 2017 and May 2018 orders. Most obviously, de Loera took her kids eleven hours west to Puerto Vallarta, where she blocked Pinto's efforts to visit them at home or at school. Even then, Pinto doggedly pursued his rights in court. And immediately after the Mexican appellate

---

[1] To the extent de Loera's attorney Alberto Woolrich disagreed, the Court deems him not credible. In an extended aside, Woolrich testified any judicial decision he disagrees with inevitably resulted from corrupt decisionmaking; in his view, Mexican judgments are worthy of respect, unless they aren't.

9

court awarded Pinto primary custody, de Loera fled to the United States to evade that order. Finally, de Loera never acknowledged Pinto's numerous emails and messages attempting to discover his children's location. Given this evidence, the Court concludes Pinto cleared the low hurdle necessary to show he would have exercised his parental rights.

**D**

Nevertheless, De Loera tries to stymie her children's return by invoking the Convention's mature-child-objection and grave-risk exceptions. The Fifth Circuit instructs both should "be applied narrowly," and only where return does not further the Convention's twin aims: "restor[ing] the pre-abduction status quo" and "deter[ring] parents from crossing borders in search of a more sympathetic court." *England v. England*, 234 F.3d 268, 270-72 (5th Cir. 2000) (internal quotation marks omitted). But here, since de Loera fails to carry the applicable burdens, the Court need not even consider their applicability.

**1**

De Loera must prove each element of the mature-child-objection exception by a preponderance of the evidence. *See* § 9003(e)(2)(B). Specifically, de Loera must show that the children have "attained an age and degree of maturity at which it is appropriate to take account of [their] views," and that they "object[] to being returned." *Rodriguez v. Yanez*, 817 F.3d 466, 474 (5th Cir. 2016) (internal quotation marks omitted) (quoting *Vasconcelos v. Batista*, 512 Fed. App'x 403, 405-08 (5th Cir. 2013)). The Fifth Circuit requires their objection be more than "a mere preference" not to return—the child must affirmatively claim "living in that country would be unacceptable." *Rodriguez*, 817 F.3d at 477. What's more, "[a] child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is

the product of the abductor parent's undue influence over the child." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986) (affirming discretionary application of the mature-child-objection exception given "the potential for brainwashing of the child by the alleged abductor").[2]

The Convention sets no explicit threshold age for determining a child's maturity, leaving courts to undertake a fact-intensive, case-by-case inquiry. Some Fifth Circuit courts have considered a thirteen-year-old sufficiently mature, *see, e.g., Vasconcelos*, 512 Fed. App'x at 407, but others have not, *see, e.g., England*, 234 F.3d at 272.

Here, a preponderance of evidence suggests no child has attained enough maturity to persuade the Court their views should control. The Court reaches this conclusion after interviewing the thirteen-year-old in camera, hearing testimony from each child's teacher, and reviewing various writings by each child. Because de Loera fails to prove her children are mature enough for the Court to account for their views, the Court will not consider the mature-child-objection exception.[3]

2

De Loera faces a greater burden to prove the grave-risk exception: clear and convincing evidence. § 9003(e)(2)(A). And her factual burden is higher, too: de Loera must show "a grave risk that [the child's] return would expose the child to physical or psychological harm or

---

[2] Since it represents "the Executive Branch's interpretation of a treaty," this regulation "is entitled to great weight." See *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (internal quotation marks omitted).

[3] And even if it did, the Court questions whether any child—particularly the three youngest—expresses a sincere objection untainted by the mother's undue influence. After all, their recent writings negatively painting Pinto must be balanced alongside their prior testimony to a Mexican judge in which they described Pinto as "nice, good, [and] caring," noted "they [we]re happy to see him and they would love to stay and sleep at his home," and added "that they love him very much and that they do want to see him." This prior testimony's proximity to the abduction— before de Loera walled them from their father for 510 days—entitles it to considerable weight.

11

otherwise place the child in an intolerable situation." *England*, 234 F.3d at 270 (alteration in original) (internal quotation marks omitted) (quoting Conv. art. 13(b)). Persuasive authority reaffirms the risk must be "grave, not merely serious," Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10,510, on the order of "returning the child to a zone of war, famine, or disease." *Friedrich*, 78 F.3d at 1069.

Yet de Loera's own testimony undermines this exception. After all, de Loera described the Pinto family's Mexico City neighborhood as one of the grandest and most exclusive in the world. And two Mexican courts—to which this Court owes comity—already rejected any suggestion that either Pinto or his family abused the children. And although Pinto and his family may rely on armed guards for protection, the Court sees that as a salutary safeguard in a city where "violent and non-violent crime is prevalent." *See* U.S. Dep't of State, Mexico Travel Advisory (Nov. 15, 2018), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html. De Loera's attempt to invoke the grave-risk exception falls flat.

## IV

In the end, because Pinto proves by a preponderance of the evidence that de Loera abducted his children from their country of habitual residence, and because de Loera fails to persuade the Court an exception to the Hague Convention should apply, the Court will grant Pinto's petition for the children's return. Additionally, because ICARA requires "[a]ny court ordering the return of a child" to "order the respondent to pay necessary expenses incurred by . . . the petitioner," Pinto may submit a timely application for "court costs, legal fees, foster home or

other care during the course of proceedings in the action, and transportation costs related to the return of the child."[4] § 9007(b)(3). A separate order follows.

Date: March 27, 2019

Royce C. Lamberth
United States District Judge

---

[4] In this case, that includes $418 to compensate an interpreter specially hired by the Court given these proceedings' technical nature.